ARTHUR E. VAILLANCOURT *v.* GRAND TRUNK RAILWAY COMPANY.

Special Term at St. Johnsbury, April, 1909.

Present: ROWELL, C. J., MUNSON, WATSON, HASELTON, and POWERS, JJ.

Opinion filed October 6, 1909.

*Master and Servant—Injuries to Servant—Release—Instruments Impeached for Fraud—Evidence—Presumption from Signing—Master's Duty—Safe Place—Duty of Inspection—Clinkers in Railroad Yard—Contributory Negligence—Assumed Risk—Questions for Jury.*

Where a party to a written instrument, whether sealed or not, impeaches it for fraud that goes to its legal existence, oral or other extrinsic evidence tending to show such fraud is admissible, although it contradicts the terms of the instrument.

In an action for personal injury plaintiff was properly allowed to show, as bearing on the extent of his injury and the resulting damages, that after the accident he was taken to a certain hospital where he remained five weeks.

In an action by a brakeman against a railroad company for injuries resulting in loss of both legs, and due to defendant's negligence, where the defence was a sealed release, signed by plaintiff and procured by defendant's claims agent, discharging defendant from all liability for $150, but which plaintiff claimed was obtained by the fraudulent representation of the claims agent that the money

was a gift and the alleged release only a receipt therefor, plaintiff was properly allowed to show, as bearing on the question of whether, when he signed the release, he understood that for so little money he thereby released defendant from all liability, that he had before that time consulted an attorney who advised that he saw no reason why plaintiff had not a good case against defendant.

Plaintiff was properly allowed to introduce in evidence a letter to him from defendant's superintendent, acknowledging the receipt of a letter from plaintiff written about six weeks after the accident, reportirig his condition and need of assistance until able to work again, in which the superintedent stated that plaintiff's letter had been referred to defendant's claim agent, who subsequently procured the alleged release from plaintiff, "with a request that he communicate direct with you regarding your appeal," as that was notice to plaintiff of the claim agent's authority in the matter.

Plaintiff's answer to the question whether an attorney had presented plaintiff's claim to defendant and demanded settlement: "No, I don't think he did, because he said he would see what he would do, and that is all there was about it," was harmless to defendant.

In an action by a brakeman against a railroad company for injuries resulting in the loss of both legs, and due to defendant's alleged negligence, where the defence was a sealed release, signed by plaintiff and procured by defendant's claims agent, discharging defendant from all liability in consideration of $150, but which plaintiff claimed was obtained by the fraudulent representation of the claims agent that the money was a gift and the alleged release only a receipt therefor, evidence as to what occurred when the release was signed considered, and *held* that plaintiff's testimony that the claims agent then told him that defendant was not liable for the accident was properly admitted as part of the *res gestae*.

It is not error to strike out a portion of a witness's answer that is not responsive to the question.

It was not error to exclude the question whether the witness in any conversations with plaintiff, or in any of his letters to him, made a designated representation, where the letters referred to were then in the case, as they were the best evidence of what they recite.

This Court cannot determine whether a cross-examination in identification of a book of rules was properly allowed, where no copy of those rules is furnished.

27

In the circumstances of this case, the small sum given for the alleged release discharging defendant from all liability bears upon the probability of whether plaintiff understood its true import, and so upon the question of fraud in procuring its execution.

Where the evidence on the issue of fraudulent representations is both oral and written and is conflicting the question is for the jury.

The trial court's remark to the jury, in connection with instructions on the issue whether a release was obtained by fraudulent representations, that "it is seldom that men admit that they perpetrate a fraud in terms," was not error, but the statement of what is common knowledge.

Where a certain piece of evidence is in no wise determinative of any issue submitted to the jury, it is not error for the court to refuse to emphasize it by commenting thereon in its charge.

The doctrine that a party is conclusively presumed to know the contents of an instrument signed by him does not obtain as against fraud.

Where a replication impeaches an alleged release for fraud in its procurement, plaintiff need prove only so much of what he has alleged as establishes that the instrument was fraudulently obtained from him without any negligence on his part.

In the trial of a case a party cannot simultaneously insist on two inconsistent positions regarding the same question.

It is the duty of the master to use the care of a prudent man to provide his servant a reasonably safe place wherein to work, and that duty cannot be so delegated as to free the master from liability for negligence in its performance.

In an action by a brakeman for injuries resulting from stumbling over a large clinker as he was attempting to mount a moving car in defendant's railroad yard, where the evidence tended to show negligence on the part of defendant in not seasonably inspecting the track, and so discovering and removing the clinker, it tended to show that the risk was an extraordinary one, not incident to plaintiff's employment, and he could recover nothwithstanding the fact that the clinker was deposited by a fellow servant.

In an action by a brakeman for injuries resulting from stumbling over a large clinker as he was attempting to mount a moving car, evidence considered, and *held* that the questions of contributory negligence and assumed risk were for the jury.

Plaintiff was not obliged to look for negligence on defendant's part, but had the right to assume the contrary, and the fact that he had

seen clinkers elsewhere on the track did not cast on him the burden of looking for them at the place in question.

CASE for negligence. Pleas, the general issue and a special plea relying on a release. Trial by jury at the October Term, 1908, Essex County, *Hall*, J., presiding. Verdict and judgment for the plaintiff. The defendant excepted.

The facts shown by the evidence on the trial of the issue of fraud sufficiently appear in the opinion. The evidence introduced on the trial of the general issue, in its most favorable view to the plaintiff, tended to show that he commenced work for the defendant June 14, 1906, and worked until he was injured, August 14, following; that at first he was sent one trip from Island Pond, this State, to Portland, Maine, and back to learn the road; thenceforth working as a brakeman, he made two round trips between the same places; then went over on the Cannon Ball from Portland to Mechanics Falls a little over two weeks; then was transferred back to Island Pond and ran again from there to Portland and back two or three trips; then he ran on the gravel train from the pit at South Paris going towards Portland for about a month; then went back to Island Pond and ran on freight train between there and Portland, having run six, seven, or eight trips when he was injured; that only when running between Island Pond and Portland did his train pass through West Paris, where the accident happened, and from which place going westerly a helping engine was used as far as Bryant's Pond some six miles further west, it being a pretty steep grade; that at West Paris there was a side track on the southerly side of the main line, and previous to the time of the accident the train on which the plaintiff was braking going westerly would pull through the main line, stopping so the caboose would be opposite the station, and the helping engine would be backed off the siding onto the main line and be attached to the rear end of the train; that the easterly switch is probably three or four car lengths from the station, and the westerly switch is farther away, not in sight from the station, and during the time of the plaintiff's service for the defendant the usual way of taking a siding and leaving it again was to go in at one end and go out at the other end,—at no time before the occasion in question did the train on which the plaintiff was braking, in allowing another train to pass in the same or

opposite direction, pull onto a siding and then after the other train had gone by back out of the same switch onto the main line again; that when the train arrived at West Paris the plaintiff was braking at the head end of the train; that the conductor of the train before reaching West Paris told the plaintiff that the train would take the siding there, but did not say anything about going out of the siding other than in the usual manner; that the train stopped easterly of the east switch, the switch was opened for the train to pull through, and then the plaintiff mounted the head car where he remained until the train was in clear of the switch, when he went to the switch at the westerly end of the side track, five or six car lengths west of the head of the train, and sat down waiting for No. 6 train to pass; that when that train had passed he unlocked the switch, took the lock out of the eye and put it onto an iron, a part of the switch, but did not open the switch or connect it with the main line; that then the engineer beckoned the plaintiff to come back, and not knowing what the engineer wanted and still supposing that the train would be run through that switch, he started back leaving the switch unlocked; that when about half way back the engineer blew the whistle for "back up," this being the plaintiff's first information that the train was to be backed out, and not having time to go and lock the switch, he mounted the head car so as to give signals, as was his duty; that the train backed out of the switch onto the main line, through which it had come in, the plaintiff locked the switch, mounted the head car, and the train started westerly toward Island Pond; that when opposite the west end switch which the plaintiff had left unlocked, he jumped off the train and locked the switch as was his duty, then walked back easterly between the siding and the main line because the train was going so fast—probably six or eight miles an hour—that he thought it not best to take the chances of getting on, he noticing also that it was slowing up a little planned to wait for a good chance; that while thus waiting he was watching the passing cars looking for a chance to get on safely; that when the caboose came along the train was going from three to five miles an hour and he attemped to mount; that he did not know the helping engine was attached behind until he noticed the smoke after it came around the curve some thirty or forty rods away; that preparatory to mounting he was getting a start

by a little run alongside the train as usual, looking for the grab iron on the car and not looking down; had gone about fifteen feet in that way and was getting ready to reach for the grab iron and swing onto the step when he stepped on a piece of clinker lying on the track, his foot was tripped thereby, and he fell before he had a change to get hold of the grab iron; that his legs were run over by the helping engine, one cut off and the other so injured as to make amputation necessary; that the clinker was half the thickness of a man's head and some nine inches wide—more flat than round and all of half as long as ''an ordinary man's head;'' that it was an old piece of clinker, cold, and had considerable sand all over it, and cinders on it, had not been seen by him, and he did not know it was there, nor did he expect a clinker would be there, but on the contrary he expected the yard there was a safe place, he then knowing that by a rule of defendant company it was the duty of the station agent to inspect the yard daily and to keep the grounds clear upon which the plaintiff was then working, which rule reads: ''They (station agents) will have charge of the company's books, papers, buildings, sidings, and grounds at their station, * * *. They will daily inspect all buildings, grounds, outhouses, etc., under their charge, and see that they are kept clean, tidy and in proper condition for use,'' and its observance was expected by the plaintiff; that on the day in question at the time of the accident the yard at that place had not been inspected, but was between one and two hours later. The testimony in chief of one expert witness, living in Island Pond and having some knowledge of the trains over the defendant's road, was that in his opinion it is essential to good railroading that the tracks be inspected every morning, because most of the traffic is in the daytime, the local trains, and it is advisable to know the tracks are in a suitable condition before the day's traffic begins, and that this would apply to a station midway between two terminal points from which trains start morning and night; while in cross-examination he testified to night trains, both freight and express, over defendant's road, and that for a line running day and night inspection at any time of the day in daylight is as good as seven o'clock in the morning. The evidence further tended to show that it is customary for conductors and brakemen on defendant's road to get on and off trains moving at the speed of five miles an hour. Other evidence is referred to in the opinion.

*H. B. Amey* and *L. L. Hight* for the defendant.

The alleged representation of defendant's claim agent that the release was only a receipt does not constitute such fraud as vitiates the instrument the purport of which plaintiff is presumed to have understood. *Fry* v. *Day*, 97 Ind. 348; *Leddy* v. *Barney*, 139 Mass. 394; *Valley* v. *Boston & Maine R. R.*, 68 Atl. 636; *Knowlton* v. *Keenan*, 4 Am. St. Rep. 282.

The evidence of fraud must be clear, precise and indubitable, otherwise case should be withdrawn from the jury. *Valley* v. *B. & M. R. R.*, 68 Atl. 636; *Denver & Rio Grande R. R. Co.* v. *Sullivan*, 21 Colo. 302.

*H. W. Blake* and *Simonds & Searles* for the plaintiff.

If the evidence tends to show fraud the question must be submitted to the jury and their finding is conclusive. *Wilbur* v. *Prior*, 67 Vt. 508; *Atkins' Est.* v. *Atkins' Est.*, 69 Vt. 270; *Bates* v. *Cain Est.*, 70 Vt. 144; *Bank* v. *Adams*, 70 Vt. 132; *Cameron* v. *Estabrooks*, 73 Vt. 73. The evidence was conflicting, it required discretion, experience and judgment to determine whether the acts complained of, in the light of the plaintiff's condition, his lack of education, his inability to understand the most ordinary English, amounted to a fraud. *Cary* v. *Hart*, 63 Vt. 334; *Vinton* v. *Schwarb*, 32 Vt. 612. And having been determined by the jury, this Court cannot disturb a verdict which the evidence, however conflicting, tends to support. *Lyndon Savings Bank* v. *International Company et al.*, 78 Vt. 169. If there was any evidence tending to establish fraud, the Court should assume the part of the testimony which tends to support the plaintiff's claim. *Wilbur* v. *Prior*, 67 Vt. 508; *Schofield* v. *Metropolitan Life Ins. Co.*, 79 Vt. 161.

It has been frequently and universally held that the gross inadequacy of price is evidence from which a jury may presume fraud and in *Howard* v. *Edgell et al.*, this Court said in case of *Brown* v. *Sawyer*, 1 Aik. 130, the rule laid down that gross inadequacy of price is evidence from which a jury may presume fraud or mistake, if there be no circumstances in the case which repudiate the presumption. Though it would be held that like inadequacy of price will not of itself establish a charge of fraud,

yet, when gross and connected with other circumstances, as the case of weakness of intellect, not amounting to insanity, it may furnish satisfactory ground for relief, especially in a court of equity. *Brown* v. *Sawyer,* 1 Aik. 130; *Howard* v. *Edgell,* 17 Vt. 9; *Christianson* v. *Chicago, St. P. M. & O. R. R. Co.,* 67 Minn. 99; *Schus* v. *Powers, Simpson Co.,* 85 Minn. 447, 69 L. R. A. 892. The rule contended for by the defendant's counsel that parol evidence is not admissible to vary a written instrument has no application when the legal existence of the instrument is in question. *Webster* v. *Smith,* 72 Vt. 12.

The plaintiff had a right to act upon the theory that the defendant had provided a reasonably safe place in which to work, and would exercise reasonable care in maintaining the place reasonably safe. *Morissette* v. *Can. Pac. R. R. Co.,* 74 Vt. 232; *LaFlam* v. *Missisquoi Pulp Co.,* 74 Vt. 136; Thompson on Neg. §4630; *Davis* v. *Central Vermont R. R. Co.,* 55 Vt. 84; *Kiley* v. *Rutland R. R. Co.,* 80 Vt. 536.

It is the duty of the master, not only to provide his servants, in the first instance, with suitable and safe machinery, and other appliances to do the work for which they are employed, but also to keep the same in proper repair, and any negligence in the performance of such duty, whether done by the master in person or by subordinate agents selected by him for the purpose, would render the master liable, and holding that the question should be submitted to the jury. *Calvo* v. *C. C. & A. Ry. Co.,* 55 Am. Rep. 28; *Sweat* v. *B. & A. Ry. Co.,* 156 Mass. 285; *Donahue* v. *B. & M. R. R.,* 178 Mass. 251; *Kansas City etc. R. R. Co.* v. *Kier,* 41 Kan. 661, 21 Pac. 770; *Kentucky C. R. Co.* v. *Ryle,* 13 Ky. 862, 18 S. W. 938; *Balhoof* v. *Mich. C. R. Co.,* 106 Mich., 606 N. W. 592.

WATSON, J. This is an action to recover damages for injuries resulting from the alleged negligence of the defendant when under its employ as a brakeman on its freight train running from Portland, Maine, to Montreal, Canada. Pleas, general issue, and special that the defendant had obtained a full release and discharge under seal from the plaintiff releasing and discharging it from all liability which may have arisen on account of the alleged negligence. The plaintiff replied that said release and discharge were procured by fraud, and that he had

tendered back the money received. A separate trial by jury was had on each issue,—an anomalous procedure,—resulting in a verdict on the issue of fraud "that the so-called release and discharge was procured by fraud" and that the plaintiff repudiated the release and tendered back the money received within a reasonable time; also for the plaintiff on the general issue, with an award of damages. The questions saved on the two trials will be considered in the same order.

Evidence was introduced tending to show that the plaintiff is a Canadian by birth, without much education; that he lived in Canada till nine years old, in the last two or three years of that time attended school there and learned to read and write French; that then he came to the United States and within the next three years attended a night school one winter and learned to read and write English "a little"; but that his understanding of the English language is very imperfect, and especially as to hard or uncommon words, and such technical words and phrases as are used in the contract of release in question.

Defendant objected to the admission of any evidence outside of the release itself on grounds reduced and stated thus: (1) that the written contract of release speaks for itself, and evidence to vary it is inadmissible; (2) that all the allegations of fraud set up in the replication are as to the legal effect of the release itself. The real issue presented, however, was whether the so-called release was fradulently obtained by the defendant of the plaintiff, he in fact intending to give only a receipt for the money received by him and, relying upon the false and fraudulent representations by the defendant, understood the paper signed by him to be only such receipt. This was within the allegations of fraud set up in the replication, and the evidence introduced by the plaintiff bearing thereon, as also some of that introduced by the defendant,—though the tendency of much of the latter's evidence was to the contrary,—tended to show that the so-called release was thus fraudulently obtained, the money being paid by the defendant as a gift or gratuity and so received by the plaintiff. The law is well settled that in cases where the alleged fraud goes to the legal existence of the instrument in question evidence, parol and otherwise, is admissible. *Webster* v. *Smith,* 72 Vt. 12, 47 Atl. 101; *Cameron* v. *Estabrooks,* 73 Vt. 73, 50 Atl. 638; *Hartshorn* v. *Day,* 19 How.

211, 15 L. ed. 605; *George* v. *Tate*, 102 U. S. 564, 26 L. ed. 232; *Oregon* v. *Jennings*, 119 U. S. 74, 30 L. ed. 323, 7 Sup. Ct. 124. And the fact that the instrument is under seal makes no difference in this respect. Mr. Chitty says that in debt on bond or other *specialty,* when the deed is the foundation of the action, evidence may be given under the plea of *non est factum* that the deed "was *void* at common law *ab initio* as that it was obtained by fraud." 1 Chit. Pl. 483. And at page 582 the same author says that to a plea of release the plaintiff may reply *non est factum,* or that it was obtained by duress or fraud. Thoroughgood's Case, 2 Co. Rep. 9a, 9b, 6 R. C., 202; *Bright* v. *Eynon,* 1 Burr. 390; *Escherick* v. *Traver,* 65 Ill. 379; *Rockwell* v. *Capital Traction Co.,* 25 App. Cas. (D. C.) 98, 4 Am. and Eng. Ann. Cas. 648; *Taylor* v. *King,* 6 Munf. (Va.) 358, 8 Am. Dec. 746; *Schuylkill County* v. *Copley,* 67 Penn. St. 386, 5 Am. Rep. 441; *Burnette* v. *Young,* 107 Va. 184, 57 S. E. 641, 12 Ann. Cas. 982.

The plaintiff was properly allowed to show that after his injury he was taken to the Lewiston Hospital, remained there five weeks, and then went to his home at Rumford Falls, Maine, and also that before the alleged settlement he had taken counsel of and had been advised by an attorney that he saw no reason why the plaintiff had not a good case against the defendant. The fact that he was thus taken to and remained in the hospital had a bearing on the question of the extent of his injury and the resulting damages; and that he took counsel and received such advice tended to show that at the time of the signing of the release he had reason to believe that he had a valid claim against the defendant for damages—thus rendering it less probable that for the small sum of money received by him from the Company he understandingly released it from all liability.

The plaintiff was injured August 14, 1906. On the 26th of the next month he wrote a letter to the Superintendent of the defendant company at Montreal respecting his (plaintiff's) condition and need of assistance in living until able to work again. The receipt of this letter was acknowledged by the Superintendent in letter marked Exhibit "A", stating that the plaintiff's letter had been referred to Mr. Wells, the claims agent, "with a request that he communicate with you direct regarding your appeal." The contention that exhibit "A" was

improperly received in evidence is unsound. It was notice to the plaintiff that the subject-matter of his letter had been put into the hands of the claims agent for further communication, and consequently of his authority concerning it.

In giving his deposition the plaintiff testified that, having no financial means, he in the spring of 1907 solicited subscriptions for his benefit, and when so doing saw Mr. Matthew McCarthy, at Rumford Falls, who gave him a dollar and wrote to the defendant company for the plaintiff. The question was then asked the plaintiff: "Did he, as you understand it, present a claim to the company and demand settlement?" Subject to exception, he answered: "No, I don't think he did, because he said he would see what he could do and that is all there was about it." On defendant's objection all that plaintiff said in the deposition relating to McCarthy was excluded down to the question and answer here quoted, which were allowed to stand. As a result of the exclusion the question and answer objected to were rendered meaningless and consequently harmless.

In cross examination by plaintiff's attorney, and subject to exception not relied upon in defendant's brief, the claims agent testified that he received a letter from Matthew McCarthy, attorney at Rumford Falls, requesting a subscription by the defendant in favor of the plaintiff, which letter was dated January 19, 1907; that the witness made a voucher for one hundred dollars in favor of the plaintiff on February 25, 1907, and the plaintiff returned to the witness the check for that amount a few days after the interview between them at Montreal, March 18, 1907. The plaintiff testified to the interview referred to, the talk then had by him with the claims agent, and the representations made by the latter. According to the evidence all verbal representations by the claims agent to the plaintiff were made on this occasion. So far as appears, the plaintiff and the claims agent were the only persons present and they materially disagree in testimony as to what was said between them. After receiving the letter from McCarthy and before this interview at Montreal, the defendant sent to the plaintiff by letter the check for one hundred dollars, accompanied by a release for him to sign releasing and discharging the defendant from all liability. The plaintiff being told on inquiry the purport of the

release did not sign it, nor did he use the check, but on the contrary went to Montreal as before stated, in his language, "for better satisfaction," and in the language of the claims agent, "to obtain an increase of a gratuity which had been offered him by letter." The plaintiff testified that he told the claims agent about the accident and asked for a job with a salary large enough to give him a living and to get a pair of legs; that upon the claims agent saying that he knew of no such job, the plaintiff asked for a settlement, to. which the claims agent said the company was not liable for the accident. The defendant argues that this last answer was but the expression of an opinion by the claims agent and that to allow it to stand was error. If the plaintiff thus asked for a settlement, it was in effect an assertion by him of a legal claim. The claims agent testified that on the occasion referred to the plaintiff made no claim on legal grounds. If this is true an inference might be drawn therefrom that the plaintiff then considered the defendant not liable, making it more probable that he understandingly received the money in full release and discharge of any claim he might have against the company, and intentionally gave a release accordingly. The plaintiff testified that the claims agent at the same interview explained to him that the words "without prejudice," used in his letters to the plaintiff, meant "that I need not be afraid of anything as they are not liable and that (the so-called release) is as a receipt for they have to know where all the money goes." The claims agent testified that he used those words in his letters to the plaintiff "to indicate that the negotiations were friendly and did not involve the rights of either party," and further because under the Canadian law an offer of compromise in settlement if not consummated may be used against the party making it in a prosecution of the case; that in this interview he called whatever he was to pay the plaintiff a gratuity because the company did not owe him anything, he having been advised by the company's solicitor that it was not liable for the plaintiff's injury, as was his own opinion also; and that the witness added to the release the clause, "This payment is made as a gratuity, and so received, the railway company denying any liability to make it," in order to show the exact nature of the document, that is to say, a release from all liability or right of action on the compensation basis of a gratuity,

and because he had been advised by the company's solicitor that there was no liability. He also testified that he knew the word "gratuity" meant gift at the time he had it written into the release. The plaintiff's evidence further tended to show that he did not accept the one hundred fifty dollars as a settlement of his claim against the company, but accepted it as a gratuity which he took to be a favor; and that at the time he signed the release he did not understand it was a release of his claims against the company, but understood it was nothing more than a receipt and signed it relying on the representations of the claims agent regarding the meaning of the words "without prejudice," used in his letters; that the payment of the money was as a gift or gratuity, and that the paper was but a receipt required to show where the money went to.

It is not necessary here to refer particularly to more of the evidence to show the importance of what was said and done by the claims agent and the plaintiff on the occasion at Montreal. The declaration of the non-liability of the defendant by the former and his agreement to pay one hundred fifty dollars to the latter, were on the same occasion and so connected as to be parts of the same transaction. The declaration to which objection is made was calculated to illustrate the character and object of the payment agreed to be made and was admissible as parts of the *res gestae. Bank of Woodstock* v. *Clark*, 25 Vt. 308; *Mason* v. *Grey*, 36 Vt. 308.

The claims agent on his examination in chief by the defendant testified that when he makes a payment in a case where he is advised by the company's solicitor that there is no legal liability, the payment is called a gratuity, but such payments are never made gratuitously—as a matter of fact they are always in exchange for a full release from any liability. He was then asked whether what he had last expressed was a statement of the facts with reference to the settlement with the plaintiff, and answered: "Yes, (and he clearly understood it so.") Again the witness was asked whether he at any time in the course of the transaction with the plaintiff which resulted in the release intended to perpetrate a fraud upon him, and answered, "Such an intention never at any time entered my mind. I made all my statements to Vaillancourt in good faith (as clearly as I could express them, and felt convinced

from his conversation with me on March 18, 1907, that he clearly understood the whole matter as I have described it.") Again, whether he stated to the plaintiff that it was a gratuity, and answered, "I used the word gratuity as I have explained (but made it clear to him that it would only be made in exchange for a full release.") One other exclusion was made of a similar nature. The parts of the answers in parentheses were stricken out, and it is urged that this was error. In every instance, however, the part thus excluded was not responsive to the question, consequently the rulings were not erroneous.

The witness was further asked, "You may state whether in any of your conversations with Mr. Vaillancourt or in any of your letters to him you represented to him or intended to represent to him that in the payment of this one hundred fifty dollars you required no release from him from any liability on account of the injury?" To the exclusion of this question and the answer thereto which need not be stated, the defendant excepted. The letters written by the witness to the plaintiff were already in the case and were the best evidence of what they contain. Since the question included them, its exclusion together with the answer was not error.

It is insisted that the plaintiff while cross-examining the claims agent was improperly allowed to examine him in identification of a book of rules such as are furnished by the defendant to its engineers, brakeman, and trainmen, and in force at the time of the accident. Yet as no copy of these rules has been furnished us, we have not sufficient information regarding them to pass upon the question.

Exception was taken to the argument of plaintiff's attorney that if the defendant was liable and the sum paid to the plaintiff was grossly inadequate to the injuries he suffered, the terrible agony and pain, the loss of his legs, and the loss in the future, then it was an element of fraud to be taken into consideration in determining whether fraud was practiced on the plaintiff. The same question in effect is raised by exception to the charge. From what is said in the first paragraph regarding the admissibility of evidence showing the extent of the injury, and of evidence showing that the plaintiff had been advised and had reason to believe the defendant was liable, it will be seen that the objection made to the argument and

charge in this respect is without merit. Since evidence of the above tendencies was in the case, the small sum paid bears upon the probability of the plaintiff's understandingly in consideration thereof giving a release in character like the one signed by him, and consequently upon the question of fraud in procuring its execution. *Brown* v. *Sawyer*, 1 Aik. 130; *Howard* v. *Edgell*, 17 Vt. 9.

At the close of the evidence the defendant moved for a verdict on the ground that upon all the evidence the plaintiff was not entitled to a verdict, and to the overruling of the motion it excepted. The case, however, was for the jury. The evidence bearing upon the question of fraud was in character both oral and written and, as has been seen from that to which reference has been made, it was conflicting.

Among other things the court instructed the jury: "No direct proof of fraud or imposition or undue influence is required from a party endeavoring to set aside an instrument unduly obtained. It is seldom that men admit that they perpetrate a fraud in terms." An exception was saved to the last sentence and it is relied upon in argument. Continuing, the jury were instructed that the party seeking to impugn an instrument on that ground must prove by a fair balance of evidence that it was obtained by fraud; that positive and direct proof is not required—circumstantial evidence if convincing by a fair balance of evidence is sufficient to establish fraud. The statement of which complaint is made is a matter of common knowledge, and in the connection used it is not subject to criticism.

Other exceptions were taken to the charge in this branch of the case, but the questions raised thereby have in principle been determined in disposing of the exceptions touching the admissibility of evidence and the motion for a verdict.

Defendant excepted to the refusal to charge in accordance with its first, second, third, fourth, sixth, and seventh requests. The first three requests are in substance embraced in the motion for a verdict and need not be further noticed. The fourth request: "This action was commenced by writ dated June 8, 1907. You will therefore find that from and after said date plaintiff knew that said action was pending in this court," was properly refused. It is said that the replication sets forth that at the

time of the negotiations between the plaintiff and defendant, the former did not know this action was pending, and it is urged that he was chargeable with such knowledge. Assuming the fair construction of the replication to be as claimed, if counsel deemed it of sufficient importance they were at liberty to call the attention of the jury to the fact in argument. It was not reversible error for the court to refuse thus to single it out for emphasis in the charge, since it was in no wise determinative of any issue submitted.

The sixth request was: ''False representations as to the legal effect of an instrument cannot invalidate the instrument, as a party signing such an instrument is presumed to know its contents and has no right to rely upon the representations of the other party as to its legal effect.'' The doctrine that a party is conclusively presumed to know the contents of an instrument signed by him does not obtain as against fraud. Consequently the request is not wholly sound in law and was properly disregarded. *Fivey* v. *Pennsylvania R. R. Co.,* 67 N. J. L. 627, 91 Am. St. Rep. 445, 52 Atl. 472. Nor was it error to disregard the seventh request which was: ''The plaintiff sets up as an element of fraud that the defendant's agent told the plaintiff as an inducement to get him to accept the one hundred fifty dollars that he had no cause of action against the defendant. Under such circumstances it would be necessary for the plaintiff in order to make out his case on that point to produce some evidence that the plaintiff did have a cause of action. This he has' not done.'' It is said that it was part of the alleged fraud set up in the replication that the plaintiff had a good cause of action and that it was necessary to prove every element of the alleged fraud in order to maintain the action. But this is not so. It was necessary for the plaintiff to prove only so much of what he had alleged as was sufficient to establish the fact that the so-called release was fraudulently procured from him without any negligence on his part. *Somers* v. *Richards,* 46 Vt. 170; *Bosworth* v. *Bancroft,* 74 Vt. 451, 52 Atl. 1050.

Moreover, it was contended by the defendant that if its agent did so tell the plaintiff, it was but the expression of an opinion which did not constitute fraud, and the court in substantial compliance with another request of the defendant, charged that mere matters of opinion, so stated and understood,

are not a basis of fraud and do not constitute fraudulent representations.    A party cannot stand on two inconsistent positions regarding the same question at the same time.

This disposes of all the questions raised upon the trial of the issue of fraud, and no reversible error appears.

The only questions raised on the trial of the general issue are based upon the overruling of defendant's motion for a verdict on the ground that upon all the evidence the plaintiff was not entitled to recover.

The law is well settled that the defendant was in duty bound to exercise reasonable care and prudence to provide the plaintiff a reasonably safe place in which to perform his work, and this duty it could not delegate to an employee without being responsible for the consequences of the negligence of such employee in the performance thereof to the same extent as it would be had the negligence been that of the company itself.    *Davis* v. *Central Vermont R. R. Co.*, 55 Vt. 84, 45 Am. St. Rep. 590; *Kiley* v. *Rutland Railroad Co.*, 80 Vt. 536, 68 Atl. 713.

The evidence tending to show a clinker between the main line and the siding at the time and place of the accident, which caused the plaintiff to stumble and fall, was confined to the testimony of the plaintiff himself, and it was not wholly uncontradicted, circumstantially at least.    Whether it was there as and in the condition testified to by him, and if so there, whether it rendered the yard in that locality not a reasonably safe place for the plaintiff to perform his duties as brakeman were questions of fact for the jury. But it is urged that the case is wholly without evidence tending to show that a proper inspection was not made.    By the rules of the company the performance of that duty was delegated to the station agent who testified that the place of the accident was half a mile away from his station, and that he could not see it from the latter place because of a curve there, and a building hides the view; that after the accident he was up where the plaintiff got hurt, ''went to light my lamps''; and in reply to the question, ''What time of day was this?'' he answered, ''I always go to light my lamps at eleven o'clock in order to get through my work''; that he had not been up to that point before that day.    Testimony was given showing that a large number of trains passed over that road both day and night, and of an expert witness, living on the line of the road, that in

his opinion it is essential to good railroading that the tracks be inspected every morning, because most of the traffic is in the daytime, and it is advisable to know the tracks are in suitable condition before the day's traffic begins.    Although the testimony of this witness was somewhat modified in cross-examination, it was all for consideration.    To be considered also in that connection was the evidence tending to show the location, size, and condition of the clinker as to being "an old piece," and cold, having sand and cinders on it.

In view of the tendency of the evidence specified or referred to above, it cannot properly be said that there was no evidence tending to show that no inspection of that part of the yard was made before the accident on the day in question, nor can it be said that there was no evidence tending to show negligence on the part of the station agent in not making such inspection at a time in the day earlier than that of the accident.    Whether such early inspection was essential to the exercise of reasonable care and prudence in providing a reasonably safe place where the plaintiff was required to work in the performance of his duties, and if not made whether the want of it constituted negligence, were questions for the jury.    *Houston* v. *Brush*, 66 Vt. 331, 29 Atl. 380; *Chicago & Northwestern Ry. Co.* v. *Delaney*, 169 Ill. 581, 48 N. E. 476; *Maydole* v. *The Denver & Rio Grande R. R. Co.*, 15 Colo. 449, 62 Pac. 964; *Babcock* v. *Old Colony R. R.*, 150 Mass. 467, 23 N. E. 325; *Donahue* v. *Boston & Maine R. R.*, 178 Mass. 251, 59 N. E. 663; *Ferguson* v. *Central R. Co. of New Jersey*, 71 N. J. L. 647, 60 Atl. 382.

If there was negligence in the performance of the master's duty in the respects named, the question of how the clinker came where the evidence tended to show it was—whether by the act of some engineer or fireman who threw it from the cab, as claimed by defendant—does not arise, and consequently the fellow servant doctrine is not involved.    *Davis* v. *Central Vermont R. R. Co.*, and *Kiley* v. *Rutland R. R. Co.*, cited above.

It is said that the plaintiff failed to show himself free from contributory negligence.    The evidence tended to show the location of the clinker about forty-five feet—probably a little less—easterly of the switchstand at the westerly end of the siding; that the plaintiff went past it in going the first time from the train to the switch that day, and again in going back to the train

28

in response to the call by the engineer, but how near he went to it on either of these occasions the evidence does not show, except by inference from other facts proved; that the next time going past he was on top of the head car going westerly, dismounting at the west switch to lock it; then went past it easterly, walking between the rails of the siding and looking at the cars of the train as they went by, watching for a chance to mount with safety, and it was then, as he was taking his steps or short run in the opposite direction beside the passing cars looking for the grab iron of the caboose to catch hold of and swing himself onto the step, that he was tripped by the clinker and fell, resulting in his injury.    On the first occasion at the switch he sat down there from twenty minutes to half an hour until after the passing of the other train, in sight of where the clinker was lying.    As before seen the clinker was covered with sand and cinders. which would have a tendency to make it of the same general color as the ground where it lay, and the plaintiff testified that he did not see it at all before he stepped on it, did not know it was there, and did not expect a clinker to be there; on the contrary expected a safe place, as good as anywhere. In cross-examination he testified that he had seen clinkers on the track before at other places, and that he thought it nothing strange to see a half burned clinker around a frog in a yard, or anywhere along the line for that matter, but that it is not the right place to leave a clinker, and they are not supposed to be there, the agent is supposed to take them off.    The fact that the plaintiff had seen clinkers on the track elsewhere did not place the burden upon him to look for them at the place in question.    He was not obliged to look for negligence on the part of the defendant; on the other hand he had a right to assume that it would use reasonable care and diligence in keeping its tracks in a safe condition for its employees to work upon.    This was so held in the Davis case, also in the Kiley case, and in *Lincoln* v. *The Central Vermont Ry. Co.*, 82 Vt. 187, 72 Atl. 821.    The evidence tends to show that when in the vicinity of the location of the clinker, or in passing it, before the accident, the plaintiff's attention was directed to the particular things necessary to enable him properly to perform his work; and that this was particularly true as he was running beside the train watching for an opportunity to mount with safety, and preparing to make the attempt

when the caboose should come along, at the very time of his injury. It cannot be said that he was chargeable as a matter of law with knowledge of the presence of the clinker where the evidence tends to show it was, nor in that vicinity. There was considerable evidence tending to show that he was not guilty of negligence in not seeing it in season to avoid the accident, and it presented a question of fact for the jury. In *Northern Pacific R. Co.* v. *Everett,* 152 U. S. 107, 38 L. ed. 373, 14 Sup. Ct. 474, the plaintiff received injuries while in the employ of the defendant as a yard switchman. He was at work in the yard coupling a car loaded with bridge timbers, and a box car. The car bearing the timbers was loaded in a dangerous and unusual manner, in that the timbers extended so far beyond each end of the car as to leave insufficient space for coupling with safety, of which fact the plaintiff had no notice or knowledge. In attempting to make the coupling his head was caught between the box car and the end of a heavy timber projecting over the end of the other car a distance of twenty-two inches, whereby he was severely injured. His attention was not called to the projecting timber until he was in the very act of making the coupling, and when his effort to avoid it was too late. It was held that there was no conclusive evidence of a want of due care on his part in not observing the projecting timber while in the discharge of his duty, and while his attention was directed to the work in which he was engaged, and that the case was an appropriate one for a jury.

It is further said that the plaintiff assumed the risk. The risk was not an ordinary one incident to the plaintiff's employment, for the tendency of the evidence is that it existed as the result of the negligence of the master itself. And as an extraordinary risk he did not assume it as a matter of law, since the evidence tends to show that no knowledge of the presence of the clinker was had by him prior to the accident, and whether it was so plainly observable that he will be taken to have known of it and to have comprehended the danger was clearly for the jury to determine. *Dumas* v. *Stone,* 65 Vt. 442, 25 Atl. 1097; *Dunbar* v. *Central Vt. Ry. Co.,* 79 Vt. 474, 65 Atl. 528; *Morrisette* v. *Canadian Pacific R. R. Co.,* 74 Vt. 232, 52 Atl. 520; *Place* v. *Grand Trunk Ry. Co.,* 80 Vt. 196, 67 Atl. 545; *Drown* v. *New England Tel. & Tel. Co.,* 80 Vt. 1, 66 Atl. 801. Nor in this

respect does the fact that the plaintiff testified to knowledge that clinkers, big and little, are commonly found around railroad yards and along the track and the right of way make any difference in the absence of actual or imputed knowledge of the particular defect which caused the accident and a comprehension of the danger attending it. If the clinkers thus commonly found are such as render the yard or track where located not a reasonably safe place for an employee to work upon, and their being there is due to the negligence of the master in failing to exercise the requisite degree of care to provide such a place,—both of which have been found by the jury in this case,—then notwithstanding such knowledge on his part as he testified to having, the plaintiff had the right to rest upon the assumption that the yard where he was performing his duties at the time of his injury was free from defects discoverable by proper inspection, and was not submitted to the danger of working in a place containing such defects because of his knowledge of the master's general neglectful methods in that respect. In *Texas & Pacific Ry. Co.* v. *Archibald*, 170 U. S. 665, 42 L. ed. 1188, 18 Sup. Ct. 777, the plaintiff sought to recover damages for a personal injury suffered while engaged as a switchman in the employ of the defendant. The defendant had received two oil tank cars from the Cotton Belt to be delivered to an oil mill at the town of the accident where they were to be filled and then redelivered by the defendant to the Cotton Belt to be carried to their point of destination over its line. One of the cars had been filled with oil, and the plaintiff was ordered to uncouple it from the empty tank car. These cars were both fitted with appliances by which if in good order the coupling pin could be removed by a lever without the necessity of the switchman going between them. This appliance on the cars in question, when the plaintiff sought to use it, was found to be out of order by reason whereof he was compelled to lean in between the cars to draw out the coupling pin for the purpose of uncoupling. As he was making this movement his feet became entangled by a broken brake rod with links of chain attached to it and a hook at its end which was hanging down under one of the cars, and which caught his feet and legs as he leaned between the cars for the purpose of doing the uncoupling, and in his effort to escape he was thrown between the moving cars and injured. The evidence tended to show that

the defendant inspected the cars going over its roads, including those from other roads, except that cars received by it from the Cotton Belt by means of a certain connecting track inside of a point called the junction, to be redelivered to that road, the defendant did not inspect, but relied upon the inspection which it presumed had been made by the Cotton Belt. The court, speaking through Mr. Justice White, said: ''The elementary rule is that it is the duty of the employer to furnish appliances free from defects discoverable by the exercise of ordinary care, and that the employee has a right to rely upon this duty being performed, and that whilst, in entering the employment he assumes the ordinary risks incident to the business, he does not assume the risk arising from the neglect of the employer with respect to appliances furnished. An exception to this general rule is well established, which holds that where an employee receives for use a defective appliance, and with knowledge of the defect continues to use it without notice to the employer, he cannot recover for an injury resulting from the defective appliance thus voluntarily and negligently used. But no reason can be found for, and no authority exists supporting, the contention that an employee, either from his knowledge of the employer's methods of business or from a failure to use ordinary care to ascertain such methods, subjects himself to the risks of appliances being furnished, which contain defects that might have been discovered by reasonable inspection.'' See also *Texas & Pacific Ry. Co.* v. *Swearingen,* 196 U. S. 51, 49 L. ed. 382, 25 Sup. Ct. 164.

*Judgment affirmed.*