ERNEST MINER *v.* FRANKLIN COUNTY TELEPHONE COMPANY.

February Term, 1909.

Present: ROWELL, C. J., MUNSON, WATSON, and HASELTON, JJ.

Opinion filed March 5, 1910.

*Master and Servant—Limits of Employment—Safe Place to Work—Obligation of Master—Injuries to Servant—Assumption of Risk—Defective Appliance—Notice—Contributory Negligence—Question for Jury—Credibility of Witnesses—Weight of Evidence.*

The voluntary offer of a servant to make himself useful in a matter not covered by any express command, does not, as matter of law, put him outside the limits of his employment, where the proffered service is accepted by his superior, though not by an approval expressed in words.

Where an agreement between a telephone company and a power company provided that either might attach its wires to the poles of the other by paying a rental therefor, and, after the telephone company had transferred its wires from a pole of the power company to a pole of its own about five feet away, the foreman of the telephone company attached to the power company's pole so abandoned a cable seat for use in splicing the telephone company's cable, which use of that pole was convenient, but not necessary, nor contemplated by the agreement, and there was nothing to show that the telephone company or power company knew that the pole was being so used, the act of the foreman amounted to an adoption of the power company's pole as a means of access to the work to be performed, and the telephone company was bound to make the place safe for its employees.

The employees of the telephone company had a right to assume, as against it, that they were entitled to use the power company's pole for the purpose indicated by the act of the foreman in attaching the cable seat thereto, and were not bound to know that the telephone company's right to use the pole had ceased with the removal of its wires.

A telephone company which, without right and in order to reach its wires, uses a pole of a power company must exercise due care to provide its employees a reasonably safe approach as regards the wires of the power company maintained on the pole. *Robinson* v. *S. J. & L. C. R. R. Co.*, 80 Vt. 129, distinguished.

A servant assumes the risks ordinarily incident to his employment, but he does not assume risks due to the master's negligence unless the servant knows and comprehends them, or they are so obvious that he will be chargeable with knowledge and comprehension.

Whether a lineman of a telephone company, who was injured while on a pole by coming in contact with a defectively insulated power wire, was guilty of contributory negligence because of the manner in which he ascended and descended *held*, under the evidence, for the jury.

Where an expert lineman of a telephone company was told by his foreman that a designated pole of a power company was a bad one, and to look out for it when he climbed it and to look out for the wires he was not thereby, as matter of law, chargeable with knowledge of a defectively insulated power wire on the pole.

The fact that a lineman of a telephone company, using the poles of a power company, understood that the power wires were inspected by the employees of the power company and not by the employees of the telephone company did not charge him with knowledge of defects in the power wires which a reasonable inspection would disclose, since he had a right to assume that the telephone company had such knowledge of the power wires as satisfied it that an inspection by its employees was unnecessary.

The closeness of observation of one making an inspection is not the measure of the care required of a servant doing dangerous work.

The doctrine that a master is relieved from liability to his servant regarding a danger whereof their knowledge or means of knowledge are the same has no application where a defect that renders the servant's working place unsafe is discoverable only by careful inspection.

In an action against a telephone company by its lineman for injuries caused by contact with the wires of a power company maintained by it on its pole which he was using in the line of his duty to the telephone company evidence *held* to justify the finding that he was in the exercise of proper care at the time of the accident.

Where the answers of a party on cross-examination are inconsistent
with other parts of his testimony it is for the jury to say what
effect shall be given to his testimony as a whole.

CASE for negligence. Plea, the general issue. Trial by
jury at the September Term, 1908, Franklin County, *Powers*, J.,
presiding. Verdict and judgment for the plaintiff. The de-
fendant excepted.

*Elmer Johnson* and *J. W. Redmond* for the plaintiff.

Here the defendant required the plaintiff to work near wires
carrying a high and dangerous voltage of electricity and was
required to exercise a very high degree of care in the performance
of its duty to the plaintiff. 2 Jagg Torts, 864; *Girandi* v. *Imp.
Co.*, 107 Cal. 120; *Clements et ux.* v. *Louisiana Electric Light
Co.*, 44 La. Ann. 692; *Ennis* v. *Gray*, 87 Hun. 355; *Moran* v.
*Corliss Steam Engine Co.*, 21 R. I. 386, 45 L. R. A. 267.

By using the pole of the power company defendant adopted
it as part of its own line, and assumed the duty of due care in
respect thereof as regards a safe working place thereon for its
linemen. *McGuire* v. *Bell Telephone Co.*, 167 N. Y. 208; *Doyle*
v. *Toledo, etc. Co.*, 54 L. R. A. 461; *Story* v. *Railroad Co.*, 70
N. H. 364, 48 Atl. 288; *Railroad* v. *Peyton*, 106 Ill. 534; *McBeath*
v. *Rawle, Admr.*, 93 Ill. App. 212; *Rinake* v. *Victor*, 58 S. C. 360.

"To refrain from giving orders which will require a ser-
vant to put himself in such a position that he will be subjected
to risk of injury from a defective instrumentality, is a duty, the
breach of which is no less culpable than the breach of the
analogous duty of abandoning the use of the defective instru-
mentality." 1 Labatt on Master and Servant, §114; *Herdler* v.
*Buck Stone Co.*, 136 Mo. 3; *Elledge* v. *Natural City Co.*, 100
Cal. 282; *Dewelxe* v. *Merame Iron Co.*, 128 Mo. 423, 54 Mo. App.
476; *Ice Machine Co.* v. *Kifer*, 26 Ill. App. 466.

The mere escape of the electric current was, in the circum-
stances, *prima facie* proof of negligence. *Drown* v. *Telephone &
Telegraph Co.*, 80 Vt. 1; *Houston* v. *Brush & Curtis*, 66 Vt. 331;
16 Am. & Eng. Enc. of Law, 448; 2 Jagg, Torts, 864; *Snyder* v.
*Wheeling Electrical Co.*, 43 W. Va. 661.

*Hunton & Stickney* for the defendant.

There is clearly no ground upon which an employer can be held liable where the servant was injured, while using for the purpose of his work, some material substance which happened to be in a convenient position, but which was not the property of the employer, and which was not used by his authority. 1 Labatt, Master and Servant, §168, p. 362; *Yearsley* v. *Sunset Tel. & Tel. Co.*, 110 Cal. 236; *Garrow* v. *Miller*, 72 Vt. 284; *Lambert* v. *Missisquoi Pulp Co.*, 72 Vt. 278; *Channon* v. *Sanford Co.*, 70 Conn. 573; *Robinson* v. *St. L. & L. C. R. Co.*, 80 Vt. 129; *Conway* v. *Furst*, 57 N. J. L. 645; *Mauer* v. *Ferguson*, 17 N. Y. Supp. 349; *Coffee* v. *N. H. & H. R. Co.*, 155 Mass. 21; *Evans* v. *Voght & Bros. etc. Co.* 25 N. Y. Supp. 509; *Kimmer* v. *Webber*, 151 N. Y. 417; *C. & A. R. Co.* v. *Maroney*, 170 Ill. 520; *Dixon* v. *W. U. Tel. Co.*, 71 Fed. 143; *Hardy* y. *Shelden Co.*, 78 Fed. 610; *McGuire* v. *Bell Telephone Co.*, 167 N. Y. 208; *San Antonio Edison Co.* v. *Dixon*, 17 Tex. Cir: App. 320.

When held liable the broad ground seems to be that as between the servant and his employer all appliances, which he is *authorized or directed* to use, ought in fairness to be placed upon the same footing as those which actually belong to the employer. The owner of such appliances and his servants are treated as constructively the agents of the employer, who always has it in his power to safeguard his servants by refraining from giving them orders which will put them in a position where their safety will be imperilled. 1 Labatt, §171; *Clark* v. *C. B. & Q. R. Co.*, 92 Ill. 43; *Central R. R. Co.* v. *Ross*, 142 Ill. 9; *Smith* v. *N. & L. R. R. Co.*, 18 Fed. 304; *McBeath* v. *Rawle*, 93 Ill. App. 212; *Stetter* v. *C. & N. W. R. R. Co.*, 46 Wis. 497; *Grand Trunk Railway Co.* v. *Tennant*, 66 Fed. 922.

Defendant is not liable, because the pole in question was not provided by it nor subject to its control, but was selected for the mere convenience of the foreman. *Malden & Melrose Gas Lt. Co.*, 168 Mass. 395; *Action* v. *N. Y. Prov. & Boston R. R. Co.*, 160 Mass. 260; *Kany* v. *Page*, 168 Mass. 217; *Regan* v. *Donovan, et al.*, 159 Mass. 1; *Brehmer* v. *Lyman*, 71 Vt. 98; *Kimmer* v. *Webber*, 151 N. Y. 423.

"An employer does not undertake absolutely with his employee for the sufficiency or safety of the implements or facilities furnished for their work, but only for the exercise of reasonable care in that respect, and when injury to an employee results

from a defect in the implements furnished, knowledge of the defect must be brought home to the employer, or proof given that he omitted the exercise of proper care to discover it.   Personal negligence is the gist of the action.''   *Devlin* v. *Smith,* 89 N. Y. 470; *Davis* v. *R. R. Co.,* 55 Vt. 85; *Harrison* v. *Detroit Ry.,* 137 Mich. 78.

MUNSON, J.   The plaintiff, an employee of the defendant telephone company, was injured while on a pole of the Vermont Power and Manufacturing Company, by coming in contact with the electric wires of the power company.   The defendant telephone company and the Vermont Power and Manufacturing Company were respectively the successors of the New England Telephone Company and the St. Albans Electric Light and Power Company, and as such took the respective rights of those companies under an agreement they had regarding the use of their plants.   This agreement provided that either party might attach its wires to the poles of the other by paying a certain rental for each attachment, but that nothing done under the agreement should operate to give either any ownership in the poles of the other.   It did not appear that the plaintiff had any knowledge of this agreement.

The pole where the plaintiff received his injury was one on which the defendant had long kept its wires by virtue of this agreement, but about six weeks before the accident it had transferred all its wires and attachments from this pole to a pole of its own standing about five feet from it.   The agreement mentioned was in force at the time of the accident, but the evidence of the defendant tended to show that it had ceased paying rent for this pole, and had abandoned and lost all its rights thereto.

The defendant excepted to the refusal of the court to direct a verdict in its favor, and to certain portions 'of the charge at variance with the grounds taken in its motion.   The points relied upon can be covered by a review of the case without referring to the exceptions in detail.

The day before the accident a cable seat had been attached to this power company pole by defendant's employees, to be used in splicing the defendant's cable.   On the day of the accident defendant's foreman said to the linemen that they would go down and splice the cable, and all went together to this point.

On arriving there, the foreman told the plaintiff and another lineman to go to a certain place and get a ladder. They were unable to get it, and the plaintiff so reported to the foreman on their return. The foreman was then on the cable seat, with his materials at hand, and was just commencing the work of splicing. After watching him awhile, the plaintiff said he guessed he would go up and help him, and received no reply. The plaintiff then ascended this pole, and stood on an upper cross-arm, and handed the sleeves to the foreman as he needed them, the foreman taking them from him and using them as he proceeded with the splicing. After working in this manner about twenty minutes, the foreman placed the bag containing the sleeves on the other side of him, which put them beyond the plaintiff's reach; and after looking on awhile the plaintiff said he guessed he would go down, and proceeded to do so, receiving therein the injury complained of. These were circumstances tending to show that the plaintiff was in the performance of his duty when he received the injury. The voluntary offer of a willing servant to make himself useful in a matter not covered by any express command, when the proffered service is accepted by his superior, although not by an approval expressed in words, cannot be said as matter of law to put the servant outside the limits of his employment.

During the interval between the removal of defendant's wires from this pole and the placing of the cable seat upon it, defendant's foreman ascended it two or three times to inspect the cable. The cable seat was attached to the pole by the foreman himself, assisted by one of his men; both going up the pole for that purpose. The use of the pole in connection with the making of this splice was convenient but not necessary, and was a use of it not provided for in the agreement above mentioned. It did not appear whether the telephone company or the power company had knowledge that the pole was being so used.

We think the undisputed facts regarding the acts of the foreman show an adoption of this pole as a means of access to the work to be performed. This was not an unauthorized use by a lineman of the property of a stranger of his own choice, as in *Yearsley* v. *Sunset Tel. etc. Co.,* 110 Cal. 236, 42 Pac. 638. It was not a casual use of the pole of another company to overcome a difficulty which was found to interfere with a work then being

done, as in *Dixon* v. *W. U. Telegraph Co.,* 71 Fed. 143. The foreman had planned and arranged to use this pole in splicing the defendant's cable, and the men had a right to assume, as against the defendant, that they were entitled to use it for that purpose. They were brought there to do the work, and no other provision was made for reaching it. The plaintiff was not bound to know that all the defendant's right to the use of the pole had ceased with the removal of its wires; for while the previous occupancy may have given him reason to suppose that the defendant had some arrangement with the power company for the use of its poles, this did not charge him with the duty of inquiring what that arrangement was. *Robinson* v. *St. Johnsbury etc. R. R. Co.,* 80 Vt. 129, 66 Atl. 814, 9 L. R. A. (N. S.) 1249.

The defendant argues that the duty to make a place safe to work in depends upon ownership or control, and refers to the case just cited in support of its claim. But the two cases are not alike. In that case the plaintiff dealt with his employer in recognition of the fact that his entire service was to be in trains and upon tracks and with employees belonging to other parties, who would be responsible for his transportation, and over whom his employer would have no control. In this case the plaintiff was permitted to work for the defendant in a dangerous place, in ignorance of the circumstances which are now claimed to have relieved the defendant from all responsibility for his safety, while leaving him without other remedy. The position taken is not tenable. The defendant saw fit to adopt this method of reaching and repairing its cable, instead of using its swing platform, which would have enabled it to do the work without using the property of another. Having made this use of property which it did not undertake to inspect and had no right to repair, it was answerable to the plaintiff for any result which reasonable inspection and repair would have prevented. We think the question of liability is to be determined as it would be if this pole and the wires attached to it had been a part of defendant's plant.

It was the duty of the defendant to use reasonable care to provide for its employees a reasonably safe place in which to do this work, and this included a reasonably safe means of approach as regards the wires. The plaintiff understood that some of his

work would be on poles carrying insulated power wires, and he assumed the risks ordinarily incident to such an employment; but this did not include risks which were due to the defendant's want of proper care, unless they were risks which he knew and comprehended, or risks so obvious that the law would charge him with knowledge and comprehension. *Drown* v. *N. E. Telegraph etc. Co.,* 80 Vt. 1, 14, 66 Atl. 801. It is not claimed but that there was evidence tending to charge the defendant with negligence, if it is to be held accountable for this pole; and the question whether the risks due to its negligence were such that the plaintiff will be charged with knowledge of them will be covered by the further discussion.

The plaintiff went up the pole between the power wires on either side of it, and received his injury in descending the same way. Different witnesses estimated the distance between the wires at this point at twelve inches and fourteen inches; but there was evidence tending to show that a climber did not have to "squeeze through" between them. No measurement of the distance was introduced. The defendant claims that it cannot be made chargeable in respect to this approach, because it was not the proper way to pass to or from the plaintiff's position above the cross-arms. It is said that this position could have been reached by climbing over the ends of the cross-arms, making use of an empty pin at the end of an upper arm, and that this was the safer way. It is true that the defendant's evidence tended to show that the men did not use the way taken by the plaintiff, and were not expected to use it, and that it was more dangerous than the other. But the evidence of the plaintiff tended to show that the men had been going up as the plaintiff did, that this was known to the foreman, and that there was little if any choice between the two ways. Each method had its own peculiar peril. In going up as the plaintiff did, the climber went between primary wires with less than the usual allowance of space, but had the advantage of having the pole by which to steady himself. In going up at the end of the cross-arms the climber was beyond the outside wire, but had nothing by which to steady himself in assuming his position on the upper cross-arm. The foreman, a witness for the defendant, testified on direct examination that the natural way to go up was to follow the pole. The evidence tended to show that the plaintiff was ignorant of the defect

which made the way he took specially dangerous. It is evident that the questions involved in this part of the inquiry cannot be disposed of as matters of law.

There was evidence tending to show that there is no danger in coming in contact with insulated wires of this voltage in a perfectly dry time, and that the day the accident occurred and the day before that were dry and warm. The plaintiff was an experienced lineman, had been in the defendant's service fourteen months, and had worked for it on poles carrying both telephone and power wires. He testified that he had seen places on the power wires where the insulation was off, and knew that the wires between which he passed in ascending this pole were of twenty-four hundred voltage, and understood the dangers incident to the use of such wires, but did not know that there was a defect in the insulation at the place where he received his injury. The foreman testified with reference to this place that the insulation on one of the wires appeared to be all right, but that there was a bare place on the other wire; that he first noticed the bare spot about seven weeks before the accident, and had seen it from time to time afterwards; that he did not know that he had ever told the plaintiff about this defect in the insulation; that he had told him before the day of the accident that this was a bad pole, and to look out for it whenever he climbed it, but had never given him a more definite warning; that when he noticed the plaintiff was coming up the day of the accident he told him to look out for the wires. This evidence of notice to the plaintiff is contradicted, but if it were not, it could not be said to have charged the plaintiff with knowledge of this defect. The warning testified to was so general that it might easily have been supposed to refer to the unusual nearness of the wires, and thus have served to mislead rather than warn the plaintiff as to the special danger.

The plaintiff testified that he had never known of any inspection of these wires by his mates, and that his understanding was that the inspecting was done by employees of the power company. The defendant claims that this knowledge cast the duty of inspection on the plaintiff, and that in undertaking to do the work without making an inspection he became chargeable with knowledge of whatever a reasonable inspection would have disclosed. The court properly rejected this view. Knowledge

that the wires had not been inspected by defendant's employees was not the same as knowledge of the existence of a defect. The plaintiff had a right to assume that the defendant was mindful of its obligation to its employees, and had knowledge regarding the wires which satisfied it that an inspection by its employees was not necessary. He was not bound to inquire as to the reasons for the course taken, nor to pass judgment upon their sufficiency. *Vaillancourt* v. *Grand Trunk Ry. Co.*, 82 Vt. 416, 435, 74 Atl. 99; *Texas & Pacific Ry. Co.* v. *Archibald*, 170 U. S. 665, 42 L. Ed. 1188, 18 Sup. Ct. 777.

It is claimed that the court erred in ignoring the doctrine which relieves the master from liability when the knowledge of the servant or his means of knowledge was equal to that of the master. That doctrine was not applicable to the case presented. The defect was one discoverable by careful inspection, and the duty of inspection rested on the defendant and not on the plaintiff. See *McKane* v. *Marr*, 77 Vt. 7, 58 Atl. 721; *Drown* v. *N. E. Telegraph etc. Co.*, 80 Vt. 1, 15, 66 Atl. 801. The closeness of observation required of one making an inspection is not the measure of the care required of a person at work.

No one observed the movements of the plaintiff in going up the pole or in attempting to return. He testified on direct examination that he thought the insulation at this place was all right; that the wires appeared all right as he observed them—the insulation in proper shape, with no bare places; that he started down as carefully as he could, and was coming down between the two pole pin wires, with his face to the pole and his right hand on the brace rod extending from the cable seat to the pole, and was far enough down so that about half of his body was below the upper cross-arm, when his memory of the occurrence ceased. On cross-examination he testified that as far as outward appearance went the wires appeared to be all right; that he did not think he observed them as he went up the pole—did not take particular care in going up—took the same care coming down as he did going up; that he took pains to avoid the wires; and did this because he had always done it, and because they were electric light wires and carried twenty-four hundred volts and might be dangerous; that he observed nothing in their appearance that would indicate to any one that they were particularly dangerous, but understood it was possible that there might be

a break there; that he had been hurt badly enough by escaping. electricity a short time before so that he would not come in contact with such a wire if he could help it, that the reason he did not come in contact with the wires going up was because he took care to avoid them—it was his habit to do so; that in going up he was near enough to the wires to see them, and was in such a position that he could have seen if there were bare places there, but that he did not see any bare places; that he had no thought at the time about whether the wires had been inspected.

Running down from the wire which the plaintiff had on his left as he descended with his face to the pole, was a leg wire which carried the current to a wire running from the bottom arm. The first person who saw the plaintiff after the contact described him as having his body or arms against the wires on either side of him and his left knee against the leg wire. This witness designated the point where the leg wire intersected with the main wire, and the point opposite on the other main wire, as the places where the body or arms of the plaintiff adhered to the wires. The surgical examination disclosed a severe burn on the right arm near the elbow, a severe burn over the left knee, and lesser burns on various parts of the body. The foreman located the bare spot of which he had knowledge at the point where the leg wire connected with the main wire, and said it was plain to be seen from the fact that the leg wire was attached to the other by being wrapped around it, and that where it was wrapped around there was no insulation. The one who made this connection, more than a year before, described the work as having been done by baring a place on the main wire, and another place on the leg wire, and tapping the two on—tapping the one on the leg wire onto the main wire. These statements are all that we have descriptive of the place as it was known before the accident. The testimony regarding the size of this place, and the location and size of other bare places at this point, is based upon observations made just after the accident. The place on the other wire, opposite the place known to the foreman, was at a point where the wire had been spliced. A witness who described these places as they appeared after the accident said of one of them that there was no tape around it at that time, but it did not appear which wire was referred to. There was evidence tending to show that a sudden and violent strain might break

the insulation, and that an escaping current would burn the insulation as well as the clothing and flesh of the person in contact.

We think it cannot be said that there was no evidence tending to show that the plaintiff was in the exercise of proper care. If there were answers obtained from him in cross-examination that were inconsistent with other parts of his testimony, it was for the jury to say what effect should be given to his testimony as a whole.  The evidence fails to establish with any degree of certainty the condition of the wires at this point before the accident, or the appearance they would present to one who observed them while ascending or descending in a perpendicular line passing between them.  There are cases where the court has refused to be bound by the statement of a plaintiff that he looked up the track where there was an unobstructed view of it for a long distance without seeing any train, when the fact that he was struck by the train showed that it must have been where the plaintiff would have seen it if he had looked.  The cross-examination of this plaintiff was apparently directed to the presentation of a case that would call for an application of the same reasoning. But the cases present obvious differences in the situation of the observer and in the prominence and definiteness of location of the thing to be looked for.  We think that the evidence above recited affords no basis for the conclusion that one ascending or descending this pole in the exercise of due care must necessarily have seen the defective insulation.

*Judgment affirmed.*